JODI LINKER, Bar Number 230273
Federal Public Defender
Northern District of California
ANGELA CHUANG, Bar Number 313445
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:   (415) 436-7706
Email:        Angela_Chuang@fd.org

Counsel for Defendant Conkey

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | **Case No.:** CR 24–154 CRB |
|---|---|
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| v. | |
| ALSON SCOTT CONKEY, | **Court:**   Courtroom 6, 17th  Floor<br>**Hearing Date:**   October 3, 2025<br>**Hearing Time:**   9:30 a.m. |
| Defendant. | |

DEF'S SENT. MEM.
*CONKEY*, CR 24–154 CRB

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION ...........................................................................................................1

ARGUMENT..................................................................................................................2

    I.      The Final Offense Level Should Be 21..............................................................2

           A.     The PSR correctly calculates the base offense level as 20 because possession of methamphetamine for sale under Cal. H&S § 11378 is overbroad and not a controlled substance offense under federal law ....................................................2

                  1.     California's definition of methamphetamine is facially broader than the federal definition of methamphetamine because it requires either that a meth analog be substantially similar in structure or substantially similar in effect, while federal law requires both.....................................................3

                  2.     California's definition of methamphetamine is broader than federal law because it includes analogs that are not intended for human consumption ..................................................................................................................6

                  3.     The modified categorical approach does not apply because § 11378 is not divisible as to whether the substance is a controlled substance or an analog....................................................................................................................6

                  4.     *Rodriguez-Gamboa* does not control here .................................................8

           B.     The Court should not apply an obstruction of justice enhancement....................9

    II.     A Sentence Of Time Served—The Rough Equivalent Of A 21-Month Sentence— Would Be Sufficient But Not Greater Than Necessary To Achieve The Sentencing Goals Of § 3553(a)........................................................................................10

           A.     The nature and circumstances of the offense......................................................11

           B.     Mr. Conkey's history and characteristics, and need for treatment .....................13

CONCLUSION.............................................................................................................19

# TABLE OF AUTHORITIES

## Federal Cases

*Borden v. United States*,
  593 U.S. 420 (2021) ...................................................................................................... 3

*Kimbrough v. United States*,
  128 S. Ct. 558 (2007) .................................................................................................. 10

*Mathis v. United States*,
  579 U.S. 500 (2016) ...................................................................................................... 7

*McFadden v. United States*,
  576 U.S. 186 (2015) ...................................................................................................... 6

*Nunez v. Holder*,
  594 F.3d 1124 (9th Cir. 2010) ...................................................................................... 5

*Rendon v. Holder*,
  764 F.3d 1077 (9th Cir. 2014) ...........................................................................5, 6-7, 7

*Taylor v. United States*,
  495 U.S. 575 (1990) ...................................................................................................... 2

*Ugalde v. Bondi*,
  2025 WL 763475 (9th Cir. 2025) .................................................................................. 8

*United States v. Booker*,
  543 U.S. 220 (2005) .................................................................................................... 10

*United States v. Carty*,
  520 F.3d 984 (9th Cir. 2008) ...................................................................................... 10

*United States v. Ceja*,
  23 F.4th 1218 (9th Cir. 2022) ....................................................................................... 8

*United States v. Flaherty*,
  2018 WL 1417216 (D. Nev. Feb. 2, 2018) ................................................................... 4

*United States v. Gonzalez-Aparicio*,
  663 F.3d 419 (9th Cir. 2011) ........................................................................................ 2

*United States v. Grisel*,
  488 F.3d 844 (9th Cir. 2007) ........................................................................................ 5

*United States v. Hernandez*,
  No. 22-CR-194-JFW-1 (C.D. Cal. March 2023).......................................................... 5

*United States v. Johnson*,
  2021 WL 260226 (N.D. Ill. Jan. 26, 2021) .................................................................. 5

*United States v. Kirilyuk*,
    29 F.4th 1128 (9th Cir. 2022) ................................................................................................ 8

*United States v. Leal-Vega*,
    680 F.3d 1160 (9th Cir. 2012) .............................................................................................. 4

*United States v. Lee*,
    704 F.3d 785 (9th Cir. 2012) ........................................................................................... 2, 3

*United States v. Lofton*,
    905 F.2d 1315–17 (9th Cir. 1990) ......................................................................................... 9

*United States v. Martinez-Lopez*,
    864 F.3d 1034 (9th Cir. 2017) ......................................................................................... 2, 3, 7

*United States v. Morales-Rodriguez*,
    744 F.Supp.3d 1036 (S.D. Cal. Aug. 13, 2024) ............................................................ 5, 7, 8

*United States v. Stitt*,
    586 U.S. 27 (2018) .............................................................................................................. 5

*United States v. Verdugo*,
    682 F.Supp.3d 869 (S.D. Cal. July 17, 2023) ............................................................. 5, 7-8, 8

**United States Sentencing Guidelines**

U.S.S.G. § 2K2.1  ..................................................................................................................... 2
U.S.S.G. § 3C1.1 ...................................................................................................................... 9
U.S.S.G. § 4B1.2 ...................................................................................................................... 2

**Federal Statutes**

8 U.S.C. § 1101 ........................................................................................................................ 5
18 U.S.C. § 3553 ............................................................................................................ 2, 10, 19
18 U.S.C. § 3582 ..................................................................................................................... 19
21 U.S.C. § 802 ..................................................................................................................... 4, 5
21 U.S.C. § 812........................................................................................................................ 4
21 U.S.C. § 813 ..................................................................................................................... 4, 6

**State Cases**

*People v. Becker*,
    183 Cal. App. 4th 1151 (2010) ..................................................................................... 4, 5, 6, 8

*People v. Davis*,
    57 Cal. 4th 353 (2013) .................................................................................................. 6, 7, 8

*People v. Silver*,
    230 Cal. App. 3d 389 (1991) ................................................................................................. 6

**State Statutes**

Cal. H&S § 11055 ....................................................................................................... 3, 4, 7

Cal. H&S § 11378 ......................................................................................................... *passim*

Cal. H&S § 11401 ....................................................................................................... 4, 6, 7

**Other Authorities**

Carrie Dennett, *A Tough Pill to Swallow: Are Dietary Supplements Safe?*, Chicago Sun Times (Apr. 22, 2021) ....................................................................................................... 9

Pieter A. Cohen et. al., *A Methamphetamine Analog Identified in a Mainstream Dietary Supplement*, Drug Testing and Analysis (2013) ....................................................................................................... 9

**INTRODUCTION**

Alson Conkey has spent the past nearly 50 years battling an overwhelming drug addiction that has consumed most of his life and that has taken everything away from him. He began abusing hard drugs like cocaine and heroin as a middle-schooler before he even hit his teenage years. Like many others, Mr. Conkey fell into substance abuse as a form of self-medication—a self-destructive behavior to help him cope with the extensive amount of trauma that he was experiencing. For most of his childhood, he was physically abused by his stepfather, who mercilessly beat him in drunken rages and who seemed to single Mr. Conkey out for the harshest beatings. In addition to the rampant abuse that Mr. Conkey suffered within his household, he had to endure a series of traumas originating from outside his household that served to further destabilize his mental state and to drown himself in drugs as a way to escape. He was raped by an older girl when he was just 12 years old. He witnessed his best friend be beaten to death by gang members when he was 13 or 14 years old, and was himself badly beaten. As a teen, he witnessed another friend's girlfriend's horrific death by suicide when she used a shotgun to blow most of her head off in their presence. It is unsurprising that Mr. Conkey has struggled with underlying mental health issues and substance abuse issues as a result of what he has gone through—both of which he knows he needs help to address. These underlying issues lie at the root of his involvement with the criminal justice system and his commission of the instant offense.

Mr. Conkey now comes before this Court for sentencing on unlawful possession of firearms stemming from his passive possession of guns and ammunition that he kept in his apartment and never used. His friend had told him that people had been heard making plans to violently rob him at his home because they knew his business was doing well. At the time, his judgment and thinking were impaired by his daily abuse of primarily meth and heroin. Not long before his friend warned him about the impending threat, Mr. Conkey had relapsed following two years of sobriety that had been the happiest, most productive years of his life. He never would have made the poor decisions that he did if he had not been abusing drugs. With the benefit of hindsight and a sober mind, he recognizes that his behavior was inexcusable. In the time that he has been in custody on this matter, he has tried to avail himself of whatever programming that he can access, which unfortunately is quite limited. Mr. Conkey knows that he has to turn his life around again. He knows that his drug use

DEF'S SENT. MEM.
*CONKEY*, CR 24–154 CRB

1

and mental health struggles have only brought him misery. He knows that he needs help to address those issues. And he is asking for that help. Mr. Conkey respectfully requests that the Court sentence him to time served with three years of supervised release, including a special condition that he immediately participate in intensive residential treatment at TRP Academy. Such a sentence is appropriate based on the factors delineated in 18 U.S.C. 3553(a).

<strong>ARGUMENT</strong>

**I.    The Final Offense Level Should Be 21**

**A.    The PSR correctly calculates the base offense level as 20 because possession of methamphetamine for sale under Cal. H&S § 11378 is overbroad and not a controlled substance offense under federal law**

U.S.S.G. § 2K2.1 provides for an enhanced base Offense Leve if a defendant has prior convictions that qualify as controlled substance offenses and receive Criminal History points. As relevant here, Mr. Conkey sustained two prior state court convictions in 2007 and 2019 for possession of a controlled substance for sale, to wit: methamphetamine, in violation of Cal. H&S § 11378. *See* Presentence Report ("PSR") ¶¶ 48–49. Mr. Conkey anticipates that the government will argue that his base Offense Level should be higher based on these two convictions. The government cannot meet its burden to prove that an enhanced base Offense Level applies in this case because Mr. Conkey's prior convictions do not qualify as controlled substance offenses per the categorical approach set forth in *Taylor v. United States*, 495 U.S. 575 (1990). Under this approach, the government bears the burden of establishing clearly and unequivocally that a defendant's state conviction—here, Mr. Conkey's convictions under Cal. H&S § 11378—falls within U.S.S.G. § 4B1.2(b)'s definition of a controlled substance offense. *United States v. Lee*, 704 F.3d 785, 789 (9th Cir. 2012).

As a first step, the Court is to determine whether the state law is a categorical match with a controlled substance offense under U.S.S.G. § 4B1.2(b). *United States v. Martinez-Lopez*, 864 F.3d 1034, 1038 (9th Cir. 2017) (en banc). This entails comparing "the elements of the statutory definition of the crime of conviction with a federal definition of the crime to determine whether conduct proscribed the statute is broader than the generic federal definition." *United States v. Gonzalez-Aparicio*, 663 F.3d 419, 425 (9th Cir. 2011) (citation and internal quotation marks omitted). ).

DEF'S SENT. MEM.
*CONKEY*, CR 24–154 CRB

"Under that by-now-familiar method, applicable in several statutory contexts, the facts of a given case are irrelevant. The focus is instead on whether the elements of the statute of conviction meet the federal standard." *Borden v. United States*, 593 U.S. 420, 424 (2021). If the state law forbids the same or less conduct than the federal offense, the two offenses are a categorical match, which ends the inquiry. *Martinez-Lopez*, 864 F.3d at 1038. If the state law covers more conduct than the federal offense, there is no categorical match. *Bautista*, 989 F.3d at 704.

If the state law covers more conduct than the federal offense, the Court must proceed to determining whether the state statute is divisible or indivisible. *Martinez-Lopez*, 864 F.3d at 1038. Courts are to "consult 'authoritative sources of state law' to determine whether a statute contains alternative elements defining multiple crimes or alternative means by which a defendant might commit the same crime." *Martinez-Lopez*, 864 F.3d at 1039. If the statute contains alternative elements, then it is divisible. *Id.* "If the statute describes different ways to prove a single set of elements, it is indivisible." *Tagatac*, 36 F.4th at 1004. If "a statute is both overbroad and indivisible, a prior conviction under that statute will never qualify as a predicate," thus ending the inquiry. *Martinez-Lopez*, 864 F.3d at 1039. If the overbroad statute is divisible, the Court is to apply to the modified categorical approach, wherein the Court "examine[s] judicially noticeable documents of conviction 'to determine which statutory phase was the basis for the conviction.'" *Id.* (citation omitted). If the defendant was convicted under elements of a state offense that match those of the federal controlled substance offense, then "the prior state conviction may serve as a predicate offense under sentencing guidelines." *Id.* If there is no match, or if the record is inconclusive, the prior conviction does not qualify as a predicate offense. *Lee*, 704 F.3d at 789–90. For the following reasons, § 11378 does not qualify as a controlled substance offense.

      **1.**    **California's definition of methamphetamine is facially broader than the federal definition of methamphetamine because it requires either that a meth analog be substantially similar in structure or substantially similar in effect, while federal law requires both**

Section 11378 criminalizes the possession for sale of any controlled substance in enumerated drug schedules, including substances listed in Cal. H&S § 11055(d). Section 11055(d) includes "any material, compound, mixture, or preparation which contains any quantity" of the listed substances,

including "Methamphetamine, its salts, isomers, and salts of its isomers." Cal. H&S § 11055(d)(2). This includes controlled substance "analogs," which are treated the same as the actual controlled substance. *See* Cal. H&S § 11401(a). Controlled substance analogs are defined as either: (1) a substance with a substantially similar chemical structure as a controlled substance **or** (2) "a substance that has, is represented as having, or is intended to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to, or greater than, the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance…" Cal. H&S 11401(b).

The Ninth Circuit has held that the term "controlled substance" as used in the Guidelines means a substance listed in the federal Controlled Substances Act ("CSA"). *United States v. Leal-Vega*, 680 F.3d 1160, 1167 (9th Cir. 2012). Federal law also criminalizes enumerated controlled substances and their analogs. The CSA covers "methamphetamine, including its salts, isomers, and salts of isomers," 21 U.S.C. § 812(c) (Schedule III, (a)(3)), as well as controlled substance analogs. 21 U.S.C. § 813. Federal law defines an analog as (1) a substance with a chemical structure that is both substantially similar to the chemical structure of a controlled schedule I or II substance **and**; (2) "which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than" such effect on the central nervous system of a schedule I or II controlled substance, or "which [a particular person] represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than" such effect on the central nervous system of a controlled schedule I or II substance. 21 U.S.C. § 802(32); *United States v. Flaherty*, 2018 WL 1417216, *3 (D. Nev. Feb. 2, 2018) ("Simply put, the government must prove both chemical similarity and similarity as to pharmacological effect on the human body when consumed.") (collecting cases).

Accordingly, California's definition of methamphetamine is overbroad because California law requires **either** that an analog be substantially similar in chemical structure to a controlled substance **or** substantially similar in actual, represented, or intended effect on the central nervous system. Cal. H&S § 11401(b); *see also People v. Becker*, 183 Cal. App. 4th 1151, 1156 (2010). By contrast, federal law requires that an analog be substantially similar to a controlled substance in both chemical

structure **and** actual, represented, or intended effect. 21 U.S.C. § 802(32)(A). Because the California statute "sweeps more broadly than the [federal statute], a conviction under that law cannot count as a [controlled substance offense] predicate, even if the defendant actually committed the offense in its generic form." *Id.* (quoting *Rendon v. Holder*, 764 F.3d 1077, 1083) (9th Cir. 2014)) (internal quotation marks omitted). Thus, § 11378 is overbroad.

At least three federal courts have held that §11378 is overbroad based on this exact issue. *See United States v. Morales-Rodriguez*, 744 F.Supp.3d 1036, 1052 (S.D. Cal. Aug. 13, 2024) (finding that an § 11378 conviction did not qualify as an aggravated felony and explaining that "the California statute for possession of methamphetamine for sale, Cal. HS&C § 11378, criminalizes more conduct than its federal counterpart, 8 U.S.C. § 1101(a)(43)(B), because it defines controlled substances more broadly . . . . [T]here are noticeable distinctions in the way that California law and federal law define controlled substance analogs."); *United States v. Verdugo*, 682 F.Supp.3d 869 (S.D. Cal. July 17, 2023) (holding that an § 11378 conviction is overbroad under the Guidelines because California definition of a controlled substance analog is broader than the federal definition for an analog); *United States v. Hernandez*, No. 22-CR-194-JFW-1, Dkt. No. 47 (Sentencing Transcript), at 11–17 (C.D. Cal. March 2023).[1]

"Where, as here, a state statute explicitly defines a crime more broadly than the generic definition, no 'legal imagination,' is required to hold that a realistic probability exists that the state will apply its statute to conduct that falls outside the generic definition of the crime." *United States v. Grisel*, 488 F.3d 844, 850 (9th Cir. 2007), *abrogated on other grounds by United States v. Stitt*, 586 U.S. 27 (2018). Nonetheless, there clearly is a realistic—not merely theoretical—possibility[2] that the state law sweeps in conduct that federal law does not, as aptly summarized by the court in *Morales-Rodriguez*:

> In *People v. Becker*, a California appellate court held that the jury properly

---

[1] Illinois also has an expansive definition of analogs that is broader than the federal definition. A district court recently held that Illinois's definition of analogs rendered its heroin definition broader than the federal definition because Illinois state law required either substantially similar structure **or** substantially similar effect whereas federal law required both—the same discrepancy that is present in California law. *See United States v. Johnson*, 2021 WL 260226, *4-*8 (N.D. Ill. Jan. 26, 2021).

[2] The Ninth Circuit has held that a single case is sufficient to establish this "realistic probability." *See Nunez v. Holder*, 594 F.3d 1124, 1129 (9th Cir. 2010).

DEF'S SENT. MEM.
*CONKEY*, CR 24–154 CRB

found that MDMA or ecstasy could constitute a methamphetamine analog because the jury heard testimony that the drug has "a stimulant effect substantially similar to the stimulant effect of methamphetamine." 183 Cal. App. 4th at 1156, 107 Cal.Rptr.3d 856. Similarly, in *People v. Silver*, a California appellate court concluded that the jury had sufficient evidence to find that MDMA was a methamphetamine analog after hearing expert testimony that the drug had a substantially similar chemical structure to methamphetamine. 230 Cal. App. 3d 389, 392–93, 396, 281 Cal.Rptr. 354 (1991); *see also People v. Davis*, 57 Cal. 4th 353, 359, 159 Cal.Rptr.3d 405, 303 P.3d 1179 (2013) (the Supreme Court of California explaining that "[a]s *Silver* and *Becker* demonstrate, the jury may find that MDMA is a[n] ... analog based on evidence of [its] chemical composition or its effects on the user"). These examples demonstrate that the greater breadth of the state statute is actual rather than theoretical—under this statute, individuals can and have been convicted for methamphetamine analogs that would not be criminalized under federal law.

744 F.Supp.3d at 1054.

### 2. California's definition of methamphetamine is broader than federal law because it includes analogs that are not intended for human consumption

Section 11378 is overbroad for a second reason. California's definition of methamphetamine includes analogs that are not intended for human consumption, Cal. H&S § 11401(b)(1), while federal methamphetamine only includes analogs that are intended for human consumption, 21 U.S.C. § 813(a). This means that, under federal law, the government must prove the additional element that the analog is intended for human consumption. *Id.* Factors to evaluate whether an analog was intended for human consumption includes the "marketing, advertising, and labeling of the substance," its efficacy for its labeled purpose, its price, and the defendant's knowledge, among other factors. *See McFadden v. United States*, 576 U.S. 186, 188, 192–93 (2015). The government has previously conceded that the same issue rendered Illinois' definition of methamphetamine overbroad. *See United States v. Tran*, No. 8-CR-2288-BTM-4, Dkt. No. 573, at 1–3 (S.D. Cal. June 18, 2020) (explaining that Illinois had removed an "intended for human consumption" element from its analog definition and accordingly stating that "the government cannot credibly argue that any difference between the Illinois state definition of 'analog' and the federal definition of 'analog' is immaterial"). The same result should obtain here; because California's law does not contain this requirement, it covers a wider set of controlled substance analogs than does the federal CSA, rendering it overbroad.

### 3. The modified categorical approach does not apply because § 11378 is not divisible as to whether the substance is a controlled substance or an analog

Per *Rendon v. Holder*, "[t]he critical distinction [between divisible and indivisible statutes] is

that while indivisible statutes may contain multiple, alternative **means** of committing the crime, only divisible statutes contain multiple **elements** of functionally separate crimes." *Rendon v. Holder*, 764 F.3d at 1084–85 (emphasis added). Elements of an offense are "those circumstances on which the jury must unanimously agree," whereas means of committing an offense are "those circumstances on which the jury may disagree yet still convict." *Id.* at 1068. The Ninth Circuit has previously held that § 11378 is divisible as to the type of controlled substance, meaning that different varieties of controlled substances constitute separate crimes—jurors must unanimously agree on whether a drug is, i.e., methamphetamine versus cocaine. *See Martinez-Lopez*, 864 F.3d at 1040–41. This is distinct from the divisibility inquiry with regard to controlled substances and their analogs.

A California state jury may convict a defendant of possession of methamphetamine for sale under § 11378 even if they do not unanimously agree whether the defendant possessed actual methamphetamine or an analog. Under California law, a controlled substance and a controlled substance analog are treated the same. Cal. H&S § 11401(a). Indeed, when passing the statute, the California legislature indicated that it was their intent "that a controlled substance analog . . . be considered identical, for purposes of the penalties and punishment . . . to the controlled substance in §§ 11054 or 11055 of which it is an analog." *People v. Davis*, 57 Cal. 4th 353, 358 (2013). "A state court decision definitively answers the question" of whether a way to commit an offense is an element that must be unanimously agreed upon by a jury or a means of committing the offense that does not require unanimity." *See Mathis v. United States*, 579 U.S. 500, 517 (2016).

Relying on state law, the courts in both *Verdugo* and *Morales-Rodriguez* correctly found that the modified categorical approach did not apply because § 11378 is indivisible as to methamphetamine and its analogs—a jury can convict a defendant of § 11378 based on possession of methamphetamine or its analog even if the jury does not unanimously agree on whether it was one or the other. *Morales-Rodriguez*, 744 F.Supp.3d at 1056 ("In light of this [California] precedent holding that possession of a controlled substance or its analog are alternate ways to commit the same crime (such that a jury 'need not agree' on which substance a defendant possessed), the Court concludes that Cal. HS&C § 11378's controlled substance element is indivisible with respect to methamphetamine and its analogs."); *Verdugo*, 682 F.Supp.3d at 873 ("And even if the [modified

categorical approach] issue had been raised, under California law there is 'no need to allege that the substance the defendant is charged with possession was an analog of a controlled substance as opposed to a controlled substance, for purposes of section 11378 and 11377.") (quoting *Becker*, 183 Cal. App. 4th at 1157).[3] This Court should find the same.

### 4.    *Rodriguez-Gamboa* does not control here

The Ninth Circuit's decision in *Rodriguez-Gamboa*, 972 F.3d 1138 (9th Cir. 2020), does not control here and does not foreclose Mr. Conkey's argument that § 11378 is overbroad. *Rodriguez-Gamboa* dealt only with the issue of whether the California definition of methamphetamine was overbroad because it includes geometric isomers. *Rodriguez-Gamboa*, 972 F.3d at 1152. The Ninth Circuit held that it was not overbroad in that way because geometric isomers of methamphetamine are a factual impossibility. *Id.* at 1154. "[C]ases are not precedential for propositions not considered . . . . Indeed, if a prior case does not raise or consider the legal implications of a legal argument, it does not constrain our analysis." *United States v. Kirilyuk*, 29 F.4th 1128, 1134 (9th Cir. 2022) (internal quotations and citations omitted). The *Rodriguez-Gamboa* Court never considered or decided the argument at issue here—whether § 11378 fails the categorical approach because of California's broader definition of analogs. Accordingly, it does not control here. *Verdugo*, 682 F.Supp,3d at 872–73 (finding that *Rodriguez-Gamboa* and *United States v. Ceja*, 23 F.4th 1218, 1226 (9th Cir. 2022), another case involving the same geometric isomers argument as *Rodriguez-Gamboa*, do not control with respect to whether § 11378 is overbroad because of differing analog definitions).[4]

---

[3] In *Becker*, the California Court of Appeal upheld an § 11378 conviction "despite contradictory testimony about whether ecstasy was methamphetamine or a methamphetamine analog. The court affirmed the conviction, holding that a juror could have found that the defendant committed the same crime on either ground. Because a juror could have found the defendant guilty under Cal. HS&C § 11378 based on possession of methamphetamine or its analog, the court concluded that a jury did not need to unanimously agree on whether the substance at hand was one or the other." *Morales-Rodriguez*, 744 F.Supp.3d at 1055–56. In *Davis*, the California Supreme Court adopted *Becker*'s rule, explaining that a jury can decide that a substance either "contains methamphetamine or amphetamine, or that it has substantially similar chemical structure or effect to methamphetamine or amphetamine" to convict a defendant of possession of that substance. 57 Cal. 4th at 362. "Proof that MDMA qualifies as a controlled substance **or** analog is an element." *Id.* at 359 (emphasis added).

[4] Recently, in another case, the Ninth Circuit noted that the petitioner "had a potentially meritorious argument that his conviction under Cal. Health & Safety Code § 11378 was not a categorial match," referenced the decisions in *Verdugo* and *Morales-Rodriguez*, and stated that "[w]e have not yet addressed this question."). *Ugalde v. Bondi*, 2025 WL 763475 (9th Cir. 2025) (unpublished).

DEF'S SENT. MEM.
*CONKEY*, CR 24–154 CRB

Unlike the geometric isomers at issue in *Rodriguez-Gamboa*, methamphetamine analogs can and do exist in the real world. There are many analogs of methamphetamine, and they have been found in unexpected places. *See Pieter A. Cohen et. al.*, *A Methamphetamine Analog Identified in a Mainstream Dietary Supplement*, Drug Testing and Analysis (2013); *see also Carrie Dennett*, *A Tough Pill to Swallow: Are Dietary Supplements Safe?*, Chicago Sun Times (Apr. 22, 2021) (describing recent follow-up studies finding unapproved drugs in supplements).[5] And as previously discussed, California does actually prosecute defendants for violations of § 11378 based on real-life methamphetamine analogs.

**B.    The Court should not apply an obstruction of justice enhancement**

Mr. Conkey maintains his objection to the application of an obstruction of justice enhancement under U.S.S.G. § 3C1.1 based on his briefly absconding from pretrial release and failing to appear for a court appearance. An enhancement under § 3C1.1 applies only if the conduct at issue was done "willfully." In the § 3C1.1 context, "'willfully' requires that the defendant consciously act with the purpose of obstructing justice." *United States v. Lofton*, 905 F.2d 1315, 1316–17 (9th Cir. 1990). Thus, for the enhancement to apply based on Mr. Conkey absconding from pretrial release, there must be evidence that he acted consciously with the purpose of obstructing the prosecution of his case. It is clear from Mr. Conkey's history as laid out in the PSR, and recent diagnoses, that he suffers from underlying mental health and substance abuse issues that inhibit rational thinking and decision-making. When he absconded from pretrial release, he was overwhelmed by these co-occurring issues, and was not in a stable place emotionally or mentally. While he was at New Bridge, he learned that his then-girlfriend, who he had trusted with his business that he had built from nothing, had run the business into the ground. *See* Chuang Decl., Ex. A (Psych Eval) at 15. She had overdrawn all his bank accounts and had charged $80,000 to his credit card. *See id.* She also controlled all of his personal belongings, including his vehicles and titles, and refused to give them back. *Id.* He felt like his life was falling apart. *Id.* These stressors sent him into a mental health and substance abuse crisis to the point where he felt suicidal. In his own words, he "freaked out" because

---

[5] Available at https://chicago.suntimes.com/2021/4/22/22395621/dietary-supplements-safety-vitamins-nutrition-wellness-effectiveness.

he felt like "everything that I cared about was being taken from me." *Id.* At that point, he had only been sober for a short period of time, meaning that his brain functioning was still distorted as a product of his past methamphetamine use. *Id.* at 22–23 (noting that research has shown "that impaired judgement and impulsive decision making occur for many months after cessation of methamphetamine use and improves over time" and citing to one such study). A mental health crisis, exacerbated by the residual effects on his decision-making capabilities of his previous substance abuse, is what caused him to violate his pretrial release conditions and miss court rather than any conscious intent to obstruct justice.

**II.    A Sentence Of Time Served—The Rough Equivalent Of A 21-Month Sentence—Would Be Sufficient But Not Greater Than Necessary To Achieve The Sentencing Goals Of § 3553(a)**

In sentencing Mr. Conkey, this Court must consider all of the directives set forth in 18 U.S.C. § 3553(a); the Guidelines are only one factor among many to be considered by the Court. *See United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007). "The overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than necessary" to achieve the goals of § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (internal quotations omitted). Those goals include the need to: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment for the offense; (4) afford adequate deterrence to criminal conduct; (5) protect the public from further crimes of the defendant; and (6) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2). Section 3553(a) also directs the Court to consider additional factors, including: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, § 3553(a)(1); the kinds of sentences available, § 3553(a)(3); the sentencing guideline range, § 3553(a)(4); pertinent Sentencing Commission policy statements, § 3553(a)(5); the need to avoid unwarranted sentencing disparities, § 3553(a)(6); and the need to provide restitution to any victims of the offense, § 3553(a)(7).

Mr. Conkey agrees that his Criminal History Category ("CHC") is III. *See* PSR ¶ 50. He disputes the PSR's calculation of a final Offense Level of 23, as discussed above and in the PSR addendum. *See* PSR Addendum ¶¶ 3–4. The PSR's resulting advisory Guidelines range is 57–71

months. PSR ¶ 104. If the Court sustains Mr. Conkey's objection to the Offense Level calculation, the final Offense Level would be 21 and the resulting advisory Guidelines range would be 46–57 months.

### A.    The nature and circumstances of the offense

On January 4, 2024, local law enforcement executed a search warrant at Mr. Conkey's residence in San Rafael. *Id.* ¶ 9. He was arrested at the scene without incident. *Id.* ¶ 10. The police then recovered various firearms and ammunition from inside his apartment. *Id.* ¶¶ 12–13. They also found drugs and drug paraphernalia consistent with personal use. *Id.* ¶ 13. Importantly, there is no evidence that Mr. Conkey ever used or intended to use any of the guns in a criminal fashion. In truth, he had never fired any of them at all. He had no idea that one pistol fired automatically because he had never used it.[6] This was a non-violent offense of passive possession, consistent with Mr. Conkey's lack of history of violence.

Mr. Conkey deeply regrets his actions and recognizes the seriousness of his criminal conduct. But it is important to provide context to what led to his commission of this offense. At the time of the offense, Mr. Conkey was in the midst of a relapse that had been triggered by his best friend's death in a bike accident in late 2021. *See* Chuang Decl., Ex. A (Psych Eval) at 13–15 (describing how Mr. Conkey spiraled back into addiction following this tragedy). Prior to his relapse, Mr. Conkey had made substantial progress in recovering from his lifelong substance abuse issues while living at a sober house, Marin Services for Men, and receiving outpatient treatment at Center Point. His underlying struggles with addiction have plagued him since he was 12 years old and drove much of his involvement with the criminal justice system over the subsequent decades, including the instant offense. *See id.* at 20 ("In my opinion, but for his addictive disorders, Mr. Conkey would not have engaged in the conduct of the instant offense . . . . Almost all of his prior criminal convictions have either been drug-related offenses, or offenses to fund his addiction. It is well known that persistent use of methamphetamine impacts executive functions which can lead to impulsive decision making

---

[6] To have an enhanced base offense level based on a firearm being of a certain type, regardless of whether or not a defendant intended to posses that type of gun or even knew it was that type of gun, seems an odd way to measure culpability.

DEF'S SENT. MEM.
*CONKEY*, CR 24–154 CRB

and impaired judgement. It is also now known that opioid use disorder impacts executive functions."). Mr. Conkey himself recognizes the influence of his drug use on the poor choices that led him here. PSR ¶ 96 (wherein Mr. Conkey explains, "I believe had I not been on dope, there's a good probability that I would not have made the bad choices I did. My drug use has ultimately stripped me of everything I loved and cared about in life."). Before federal charges were filed, he had already taken steps to move back into Marin Services for Men because he knew that getting sober again was crucial to rebuilding his life. PSR ¶ 95.

And his substance abuse was not the only contributing factor to his conduct here. In 2022, he learned from a friend that there were people planning to rob him. Chuang Decl., Ex. A (Psych Eval) at 15. He felt scared and was worried that he would be targeted in a violent robbery that would strip him of the money and belongings that he had worked so hard to accumulate through his pest control business that he had started from scratch. *See id.*; PSR ¶ 15 (describing a recorded jail call that was admitted at Mr. Conkey's bench trial wherein he stated, "I'm sorry I made a mistake. I was collecting guns. I bought one because . . . [s]omebody was trying to rob me because they thought I was some old dope fiend, and I have a business and they thought I'd be an easy mark or something."). Mr. Conkey's friend, Valentina Garcia, heard from her mother in late 2022 that certain people were planning to rob Mr. Conkey. Declaration of Valentina Garcia ¶¶ 6–10. People had noticed that he had a successful business, including people who were known to engage in home burglaries, and her mother heard of a plan to rob him at gunpoint in his house. *Id.* ¶¶ 7–10. Those same people had begun asking around about Mr. Conkey's habits, his schedule, and what items of value he had in the house, including a safe with money. *Id.* ¶¶ 8–9. Upon learning of this, Ms. Garcia went straight to see Mr. Conkey to warn him and to tell him that "he needed to protect himself, as these people were serious about robbing him and using violence to do so." *Id.* ¶¶ 11–12. It was the fear from this impending threat that prompted Mr. Conkey to engage in the instant offense in an effort to protect himself. It was never his intent to harm anyone. Nonetheless, he recognizes that it was the wrong way to handle the situation and that he should not have possessed a firearm for any reason.

To be clear, Mr. Conkey is not seeking to justify or excuse his criminal behavior. He knows that regardless of his motivations, what he did was wrong and he will face consequences for his

conduct. Nor is he trying to avoid taking responsibility for his actions. That is why he offered to enter into a conditional plea agreement following the denial of his motion to suppress. When the government rejected that offer, he informed them well in advance that he would waive his right to a jury trial, would not contest their evidence at trial, and was willing to stipulate to various facts and/or testimony. At the bench trial, the defense made no arguments and questioned no witnesses. In recognition of that, the government has acknowledged that he has accepted responsibility. *See* PSR ¶ 18. He is enormously remorseful and has spent the nearly two years that have elapsed since this offense examining what led him here and trying to address his underlying issues so that he will do better in the future.

### B. Mr. Conkey's history and characteristics, and need for treatment

Mr. Conkey' history and characteristics clearly call for a significant downward variance. As laid out in the PSR and in far greater detail in a psychiatric evaluation, much of Mr. Conkey' life has been characterized by abuse, drug addiction, and a series of unresolved traumas. Unsurprisingly, this history led to underlying mental health and substance use issues that have driven his interactions with the criminal justice system. Both of his parents had problematic relationships with alcohol, though were largely able to function despite these issues. Chuang Decl., Ex. A (Psych Eval) at 2–3. They separated when Mr. Conkey was quite young, around four years old, at which point his mother married his first stepfather. PSR ¶ 74. It was at this point that the rampant physical abuse began. His stepfather was also an alcoholic, but unlike the other adult figures in Mr. Conkey's life, he was a mean and violent drunk. He would beat Mr. Conkey and the other children with "fists, his feet, a belt, a belt buckle, a garden rake – anything really." Chuang Decl., Ex. A (Psych Eval) at 3. Of the children in the home, Mr. Conkey was his stepfather's primary target and he received the brunt of the physical abuse. *Id.* The relationship with his stepfather utterly confused Mr. Conkey as a child, as he seemed to be his stepfather's favorite child but was also abused the most. Id. The beatings were serious enough that Mr. Conkey would sometimes not go to school so that no one would see his injuries. *Id.* The abuse continued until Mr. Conkey was 15 or 16, and finally fought back after his stepfather threw him through a door. *Id.* at 4.

He also endured numerous traumas that occurred outside the household as well. At a young

age, he was exposed to regular intravenous drug use at a local "shooting gallery," where people paid him to help them inject drugs. PSR ¶ 76. When he was 12, he was raped by an older teenage girl, who punched him in the stomach and forced him to have sex with her while her brother watched. Chuang Decl., Ex. A (Psych Eval) at 6. Not long thereafter, he and his best friend were attacked and beaten by gang members. PSR ¶ 77. Mr. Conkey survived, but his friend died in his presence. *Id.* When he was in high school, he witnessed his friend's girlfriend put a shotgun in her mouth and blow her own head off. *Id.* The traumas did not stop when he became an adult either. He has been shot twice—once in the 1980's and once in 2001. *Id.* ¶ 89. He has suffered numerous head injuries, with a variety of causes ranging from physical abuse to motorcycle accidents to propane explosions. Chuang Decl., Ex. A (Psych Eval) at 6–7. During a prison riot in the 1990's, he sustained a broken jaw, a dislocated shoulder, 11 puncture wounds, and broken ribs. *Id.* at 8. After each and every traumatic event that he experienced—of which there were many, any one of which would be enough to overwhelm anyone, let alone a child—he isolated himself and turned to drugs as a solace and to quiet his trauma symptoms.

Mr. Conkey's struggles with substance abuse began when he was just 12 years old and escalated quickly as he turned to drugs as a coping mechanism to numb himself and remove himself from what was happening to him. Mr. Conkey's introduction to drug use was neither gradual nor tentative. At the age of 12, he was using not only alcohol, but also cocaine and heroin. *See id.* at 10–11. His first time using cocaine made him feel so jittery and anxious that he went to a nearby "shooting gallery" in search of heroin to help him come down. *Id.* at 11. Once he had tried heroin, it quickly became one of his main drugs of choice that sent him down a path of doing whatever he could to obtain money to buy more, including stealing from his family and from stores. *See id.* at 5, 11. His worsening drug addiction—itself a self-destructive behavior brought on by childhood trauma—thus fueled even more self-destructive behaviors, including addiction-driven criminal conduct that landed him in jail or prison time and again that did nothing to address his underlying issues. When he moved to San Francisco in the late 1990's, Mr. Conkey added methamphetamine to his list of go-to drugs, beginning by using it intravenously, then moving to smoking it, snorting it, or even injecting it up his anus. *Id.* at 11. He frequently abused "goofballs," a mixture of meth and

heroin. PSR ¶ 93. He used drugs daily and got to the point where he would need to use drugs in order to be able to leave the house to obtain more drugs.

It is abundantly clear that Mr. Conkey's underlying addiction and co-occurring mental health issues, both of which likely stem from the substantial amount of trauma that he has experienced and both of which impacted his judgment and decision-making capabilities, are the source of all of his legal troubles and his interactions with the criminal justice system. Essentially all of his prior convictions and contacts with the system relate to his drug abuse. *See* Chuang Decl., Ex. A at 8–9, 20. Amongst other things, he has been diagnosed with Other Specified Trauma and Stressor Related Disorder and has "experienced trauma that has led to clinically significant symptoms and impairment in functioning." *Id.* at 18–19. As Dr. Datta explains,

> As a result of Mr. Conkey's traumatic experiences he has experienced, Mr. Conkey has repeated unwanted memories of the traumatic experiences, has tried to avoid these memories, has avoided external reminders of the trauma, has had trouble experiencing positive emotions, experienced irritability and anger, has difficult concentrating and difficulty with sleeping. He has also used substances including heroin, cocaine, and methamphetamines to obliterate distressing memories and emotions related to his traumatic experiences.

*Id.* at 19. Mr. Conkey also suffers from Persistent Depressive Disorder with Major Depressive Episodes, which has only been exacerbated by his incarceration. *See id.* at 16, 18. He attempted suicide while at Santa Rita Jail in 2024 and previously attempted suicide while in Marin County Jail in 2019. *Id.* at 10. Fortunately, after he was prescribed Lexapro, his mental health has improved significantly and has helped to minimize his depressive symptoms. *Id.* at 15.

To put things bluntly, Mr. Conkey has hit his rock bottom. Violating his pretrial release conditions landed him back in custody and ruined his opportunity to participate in CAP. He has lost his business, his belongings, his life that he had built for himself. And all of that happened because of his actions and the poor decisions that he made. That is a hard truth that he has had to reckon with every single day that he has been in custody. Not an hour goes by that he is not filled with regret. Chuang Decl., Ex. D (Alson Conkey Letter) ("The irony of it is that being in jail, makes just about everything useless to me . . . . I was not thinking clearly. I was absolutely operating on emotion. I felt I was losing everything I had worked so hard to create. I felt fooled, played, used, angry and so much more. I would cry randomly throughout any given day(s) until I pulled that nonsense, and to make it

DEF'S SENT. MEM.
*CONKEY*, CR 24–154 CRB

15

worse, after I discovered they were tossing me out, I lost it. So I left, which is why I'm now in custody instead of doing drug court."). He suffers from numerous physical health issues that have made incarceration even harder than it normally would be. *See* PSR ¶ 88. To make matters worse, his mother was diagnosed earlier this year with terminal cancer in the form of Stage IV leiomyosarcoma. Chuang Decl., Ex. E (Doctor Letter). She has been in hospice care for the past several months, which is by its nature unpredictable, and Mr. Conkey fears that every day may be her last. It has devastated him that he has been unable to be more than a telephonic presence in her life during this exceedingly difficult time; indeed, that has been one of the hardest aspects of the punishment that he has already faced, and a significant underpinning to his realization that he has to get his life on a more productive path.

Importantly, Mr. Conkey's history is overwhelmingly non-violent. Violence is not in his nature, as attested to by those who know him best. *See, e.g.*, Chuang Decl., Ex. B (Letters of Support, Maraea Master Letter) ("Throughout his life, Al has been a gentle and nonviolent person."); (Letters of Support, Susan Manson Letter) ("He has never been a violent person and has always been kind."); (Letters of Support, Gabriel Leota Letter) ("I've never known him to be violent, and I've certainly never known him to possess weapons or pose a threat to others. The recent charges have left me heartbroken and confused, because they don't reflect the person I know."); (Letters of Support, William Loew Letter) ("I do know one thing. He is not a violent person. It is not his makeup. He is one of the most decent men I know."); (Letters of Support, David Weckler Letter) ("If I had not trusted implicitly that Al was much more a security asset than any kind of threat, I would not have hired him to work around our property, where my daughter and her friends are living."). His arrest in June 2024 on a misdemeanor charge of domestic violence was an absolute anomaly and completely outside of the norm. Not only was the case dismissed shortly thereafter, but the purported victim—his wife—has been and continues to be one of his strongest supporters. Shortly after that arrest, she submitted a lengthy letter to Magistrate Judge Tse asking that Mr. Conkey be given another opportunity to participate in residential drug treatment. Chuang Decl., Ex. F (Maraea Master Previous Letter). In a more recent letter, she explains what actually happened when he was arrested that day:

> At the time, Al was overwhelmed by the fear of losing everything he had worked so hard to build . . . . I was equally overwhelmed. I feared for Al's

DEF'S SENT. MEM.
*CONKEY*, CR 24–154 CRB

16

well-being, knowing how vulnerable he was to relapse . . . . When Al came to my home, we argued. He was insistent on getting the keys to his car, and I refused to give them to him. I didn't know what else to do, so I called law enforcement—not because I feared for my own safety, but because I felt helpless and needed support in that moment. I want to be absolutely clear: in all the years I've known Al, he has never been violent toward me. I have never felt physically unsafe around him. That incident was not about aggression—it was about fear, desperation, and two people caught in a moment of crisis.

Chuang Decl., Ex. B (Letters of Support, Maraea Master Letter). As part of Dr. Datta's evaluation of Mr. Conkey, he assessed Mr. Conkey's risk of future violence or dangerousness and came to the conclusion that "**Mr. Conkey does not pose a substantial danger of physical harm to others**." Chuang Decl., Ex. A (Psych Eval) at 22 (emphasis in original). Dr. Datta identified a number of factors that supported this conclusion, including *inter alia*, Mr. Conkey's "lack of early violent behavior, lack of significant violence history, . . . lack of evidence of violent attitudes, . . . [and] absence of current violent ideation and intent." *Id.* Treating Mr. Conkey's underlying substance abuse and mental health issues would additionally reduce any risk of violence. *See id.* at 23.

Despite the challenges that Mr. Conkey faces—with his extensive history of trauma, drug addiction, and mental health struggles—he is not beyond hope for rehabilitation. Far from it. He has been successful in the past and he can do it again. Following his 2019 conviction, Mr. Conkey turned his life around. His engagement with the programming at Marin Services for Men did wonders for him. He was finally able to get sober for the longest stretch of time than he ever had before, and he started his own pest control business that became successful enough that he was able to give back to the community and hire other justice-involved individuals who were going through the same re-entry adjustment that he had; the numerous letters of support that have been submitted on his behalf universally describe his generosity and the positive impacts he has had on other people's lives. *See, e.g.*, Chuang Decl., Ex. B (Letters of Support, Susan Manson Letter) ("5 years ago he had been in jail and enrolled himself and completed a years program in a men's residential 12 Step Program. Following completion there he started and grew a company primarily hiring others who had been in jail as he knew from experience how difficult getting jobs with a record. Before all of this he had productive years and was finally seeming to get out his shame for his life,"); (Letters of Support, Gabriel Leota Letter) ("But I also ask that you consider the ways my stepfather has contributed

DEF'S SENT. MEM.
*CONKEY*, CR 24–154 CRB

17

positively to others. He has helped people in recovery find employment and rebuild their lives. He's offered second chances to those who needed someone to believe in them. That's the kind of impact he's capable of making when he's given the opportunity to heal."); (Letters of Support, Maraea Master Letter) ("I've seen Al at his best. I've seen him complete treatment, stay committed to recovery, and thrive when surrounded by structure and support. Those were the most joyful and productive years of his life. He was present, reliable, and hopeful. I believe with all my heart that he can return to that place—but only if given the opportunity to heal."). Even when Mr. Conkey was in the throes of his addiction, he tried his best to look out for his loved ones and to teach his children that they should not follow in these particular footsteps. *See* Chuang Decl., Ex. B (Letters of Support, AJ Conkey Letter) ("I understand that addiction is a disease. I've watched it take hold of someone I love, and it's heartbreaking. But I also know my dad can recover—because he has before. He just needs help and support. Ironically, despite his own struggles, my dad has always taught me to stay away from drugs. Because of him, I've stayed focused.").

The comprehensive psychiatric evaluation of Mr. Conkey that was conducted in relation to this case has provided valuable insight into the root causes of his criminal conduct. Lasting change is more likely to occur if one treats the underlying causes rather than the symptoms, and the first step in that process is identifying what those causes are. With that knowledge in hand, Dr. Datta recommends a number of treatment components intended to address both Mr. Conkey's mental health issues and substance abuse disorders, including: psychiatric treatment; medication assisted therapy; contingency management; individual psychotherapy; dual diagnosis residential treatment; and random drug testing. Chuang Decl., Ex. A (Psych Eval) at 20–22. Mr. Conkey is in agreement with all of these recommendations and is more than willing to engage with whatever supportive services may be available to him. That is what he needs, and more importantly, that is what he wants. Unfortunately, while he has been in custody in San Francisco County Jail since early 2025, the options for in-custody programming are essentially nonexistent due to staffing shortages and frequent lockdowns. But when he previously was housed at Santa Rita Jail, he voluntarily participated in and completed multiple substance abuse programs because he knew that would help better prepare him for his eventual release. *See* Chuang Decl., Ex. C (Certificates).

DEF'S SENT. MEM.
*CONKEY*, CR 24–154 CRB

Mr. Conkey has been screened and accepted into the TRP Academy—an intensive, long-term residential treatment program in San Francisco that runs anywhere from 6–30 months. *See* Chuang Decl., Ex. G (TRP Acceptance Letter). TRP Academy is also able to help connect its participants with mental health treatment, as its parent organization—Westside Health—also offers mental health services and is experienced at working with individuals like Mr. Conkey who have co-occurring disorders.[7] Given that Mr. Conkey's past period of sobriety, which was the happiest time of his life, came from his engagement with Marin Services for Men, he plans to move back into their sober living environment upon completion of residential treatment to help structure his transition back into the community. TRP Academy will have bed space available for Mr. Conkey on his sentencing date. Significantly, "Treatment is more likely to be successful at this point than it was in early 2024 given that Mr. Conkey is motivated to engage in treatment now and the aforementioned issues with his business and ex-girlfriend have been resolved, which was not the case at that time. Furthermore, given that Mr. Conkey has been abstinent from opioids and stimulants during his current incarceration, his judgement, decision-making, and ability to benefit from treatment are all improved from early 2024 as his brain has had more time to recover from the effects of his substance use." Chuang Decl., Ex. A (Psych Eval) at 23. By the time of sentencing, Mr. Conkey will have served the rough equivalent of serving time on a 21-month sentence. No custodial time beyond that which he has already served is warranted. It is an axiom that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). What Mr. Conkey truly needs to be successful in the future is not protracted incarceration, but rather therapeutic interventions to address the underlying causes that led Mr. Conkey here.

**CONCLUSION**

For all the reasons set forth above, Mr. Conkey respectfully requests that the Court impose a sentence of time served with three years of supervised release with a special condition that he participate in the TRP Academy program. Such a sentence is sufficient but not greater than necessary to achieve the sentencing goals laid out in § 3553(a).

---

[7] https://www.westside-health.org/adult-mental-health-services.

DEF'S SENT. MEM.
*CONKEY*, CR 24–154 CRB

19

Dated:       September 26, 2025                 Respectfully submitted,

                                                JODI LINKER
                                                Federal Public Defender
                                                Northern District of California

                                                              /S
                                                _____
                                                ANGELA CHUANG
                                                Assistant Federal Public Defender