1  CRAIG H. MISSAKIAN (CABN 125202)
   United States Attorney
2
   MARTHA BOERSCH (CABN 126569)
3  Chief, Criminal Division

4  PHIL HUYNH (NYBN 4622890)
   Special Assistant United States Attorney
5
        450 Golden Gate Avenue, Box 36055
6       San Francisco, California 94102-3495
        Telephone: (415) 818-5820
7       Fax: (415) 436-7027
        phil.huynh@usdoj.gov
8
   Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 24-CR-00154 CRB |
| Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | Hearing Date: October 3, 2025 |
| ALSON SCOTT CONKEY, | Hearing Time: 9:30 a.m. |
| Defendant. | Hon. Charles R. Breyer |

U.S. SENTENCING MEMO
24-CR-00154 CRB

TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................................1

BACKGROUND ...................................................................................................................................2

ARGUMENT .........................................................................................................................................6

I. The Guidelines Range Is 97 to 121 Months..............................................................................6

    A. The Obstruction Adjustment in § 3C1.1 Applies................................................................7

    B. Mr. Conkey Has Two Prior Convictions for Controlled Substance Offenses for Purposes of § 2K2.1(a)(1) .................................................................................................7

II. The Court Should Sentence Mr. Conkey to 97 Months' Imprisonment ........................................12

    A. A 97-Month Sentence Is Necessary to Specifically Deter Mr. Conkey ............................12

    B. Incarceration Is Necessary to Protect the Public................................................................13

CONCLUSION....................................................................................................................................14

U.S. SENTENCING MEMO  
24-CR-00154 CRB

i

TABLE OF AUTHORITIES

Cases

*Cabantac v. Holder*, 736 F.3d 787 (9th Cir. 2013) .................................................................... 11

*Gonzales v. Duenas–Alvarez*, 549 U.S. 183 (2007) .................................................................. 10

*People v. Becker*, 183 Cal. App. 4th 1151 (Cal. Ct. App. 2010) ............................................... 10

*Ugalde v. Bondi*, No. 23-2400, 2025 WL 763475 (9th Cir. Mar. 11, 2025) ............................. 10

*United States v. Acevedo-De La Cruz*, 844 F.3d 1147 (9th Cir. 2017) .................................... 10

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) ................................................................. 6

*United States v. Casey*, 444 F.3d 1071 (9th Cir. 2006) ............................................................ 10

*United States v. Ceja*, 23 F.4th 1218 (9th Cir. 2022) ................................................................. 7

*United States v. Cowan*, No. 23-50007, 2024 WL 2717398 (9th Cir. May 28, 2024) .... 7, 9, 10

*United States v. Leal-Vega*, 680 F.3d 1160 (9th Cir. 2012) ....................................................... 7

*United States v. Martinez*, No. 23-50011, 2024 WL 2717714 (9th Cir. May 28, 2024) ... 7, 9, 10

*United States v. Morales-Rodriguez*, 744 F. Supp. 3d 1036 (S.D. Cal. 2024) .......................... 8

*United States v. Nazerzadeh*, 73 F.4th 341 (5th Cir. 2023) ....................................................... 8

*United States v. Rodriguez-Gamboa*, 972 F.3d 1148 (9th Cir. 2020) ....................................... 7

*People v. Silver*, 230 Cal. App. 3d 389 (Cal. Ct. App. 1991) .................................................. 11

*United States v. Vega-Ortiz*, 822 F.3d 1031 (9th Cir. 2016) ................................................... 11

*United States v. Verdugo*, 682 F. Supp. 3d 869 (S.D. Cal. 2023) .............................................. 8

*United States v. Woods*, 571 U.S. 31 (2013) .............................................................................. 9

Statutes

18 U.S.C. § 3553(a)(2)(C) ......................................................................................................... 13

21 U.S.C. § 355 ............................................................................................................................ 9

21 U.S.C. § 360b .......................................................................................................................... 9

21 U.S.C. § 802(32)(C)(iv) .................................................................................................... 8, 9

26 U.S.C. § 5845(a) ................................................................................................................... 6

Cal. Health & Safety Code § 11401(c)(3) ................................................................................. 9

U.S. SENTENCING MEMO                         iii
24-CR-00154 CRB

# INTRODUCTION

The government recommends that Mr. Conkey receive a sentence of 97 months of incarceration—the low end of his sentencing-guidelines range of 97 to 121 months for his conviction of being a felon in possession of firearms—and the maximum 3 years' supervised release. A sentence at the low end of the range accounts for Mr. Conkey's hard upbringing and lifelong struggle with addiction, while also serving as a specific deterrent to any recidivism and protecting the public from the danger Mr. Conkey poses as a felon who possessed 6 firearms and nearly 500 rounds of ammunition. The maximum period of supervised release will give Mr. Conkey the best chance of successfully reintegrating into society after the recommended term of imprisonment and avoiding relapse and recidivism. While the presentence report calculates the guidelines range as 57 to 71 months, it does so only because it does not count Mr. Conkey's prior convictions for possession for sale of a controlled substance under California law as "controlled substance offenses" under the sentencing guidelines. In fact, those convictions do count, and counting them makes the guidelines range 97 to 121 months.

Mr. Conkey's extensive criminal history and drug use demonstrate that, unfortunately, only a significant term of incarceration has any hope of deterring him from reoffending. He has been convicted of 12 felonies, including this one, dating back to when he was 28. (He is now 60.) As a result, he has been previously sentenced to over 250 months' imprisonment in total, including an aggregate 9-year sentence in 2007 for charges including being a felon in possession of a firearm and ammunition (which accounted for 4 years and 8 months of the sentence). Yet he has committed the same crime again. Without a stiffer sentence, which a 97-month sentence would offer, specific deterrence of Mr. Conkey will fail, as it did here. Taking Mr. Conkey at his word, he "collected" guns because he was using drugs and was afraid of being robbed. He believes his lifelong substance abuse, which has included daily heroin and methamphetamine use, led to his committing the instant offense. But he has been in and out of rehab at no fewer than 9 facilities, the last of which was the New Bridge Foundation, to which he was released pretrial and from which he absconded. None of these attempts to cure his addiction succeeded, and without a sentence significant enough to deter Mr. Conkey, he will fall back into the cycle of drug

use and criminality, including possession of firearms and ammunition.

Such a sentence is also necessary to protect the public. Mr. Conkey possessed nothing short of an arsenal: an AR-15-style rifle with a red-dot sight, a shotgun, two revolvers, two ghost pistols (one of which fires fully automatically and qualifies statutorily as a "machinegun"), parts for a third ghost pistol, and 486 rounds of ammunition. He has demonstrated his ability to arm himself and pose a grave danger. He has also admitted to having mental-health struggles. When he absconded from drug treatment during pretrial release, he said, "I am not ready to be incarcerated again, and I'd rather have death by police." Death by police would require him to instigate a firefight with officers to have them kill him. Mr. Conkey poses too much of a threat to public safety not to be incarcerated.

## BACKGROUND

Based on the presentence report, Mr. Conkey no doubt endured terrible circumstances as a child. (PSR[1] ¶¶ 72-80.) The government does not repeat them here.

Crime and substance abuse have permeated Mr. Conkey's life in adulthood. He was convicted for the first time at 24 in Connecticut of forgery and larceny and has been convicted 20 more times in the ensuing years, including his conviction in this case. (*See* PSR ¶¶ 34-49.) Eleven of those convictions (excluding this one) were for felonies, for which he was sentenced to over 250 months' imprisonment in the aggregate. (*See id.*) In 2007, he was convicted of being a felon in possession of a firearm (a sawed-off shotgun), being a felon in possession of ammunition, possession for sale of a controlled substance, and taking a vehicle without the owner's consent. (*See* Huynh Decl.[2] Exs. A; C, at 1.) He received a total sentence of 9 years for these offenses, 4 years and 8 months of which were attributable to the counts for possessing a firearm and ammunition. (*See* Huynh Decl. Ex. A, at 1; B, at 2.) The complaint specifically charged for the count of possession for sale of a controlled substance (under Section 11378 of the California Health and Safety Code) that the controlled substance was methamphetamine. (*See* Huynh Decl. Ex. C, at 7.)

---

[1] References to "PSR" are to the presentence report in this case.
[2] References to "Huynh Decl." are to the Declaration of Phil Huynh in Support of United States' Sentencing Memorandum.

U.S. SENTENCING MEMO                                2
24-CR-00154 CRB

Mr. Conkey was also convicted of violating Section 11378 in 2019. (*See* Huynh Decl. Ex. D.) There, too, the charging instrument specified in the Section 11378 count that the particular controlled substance that Mr. Conkey possessed for the purpose of sale was methamphetamine. (*See* Huynh Decl. Ex. E, at 2.)

His drug use has been heavy and continuous. He used heroin and methamphetamine daily up to his arrest, apart from brief periods of sobriety. (PSR ¶ 93.) And many past attempts at rehab have failed. He has tried programs at Walden House, Marin Services for Men, Center Point, Silverhill, Guenster Rehab, Daytop, Delancey Street, St. Anthony's, and most recently the New Bridge Foundation. (PSR ¶ 94.) Mr. Conkey told Probation, "I believe had I not been on dope, there's a good probability that I would not have made the bad choices I did." (PSR ¶ 96.)

In addition to his substance abuse, Mr. Conkey has suffered in his mental health. The presentence report details these issues. (*See* PSR ¶ 90.)

This case stems from the execution of a search warrant by state authorities on Mr. Conkey's home and vehicles on January 4, 2024, which uncovered an AR-15-style rifle with a red-dot sight, a shotgun, two revolvers, two ghost pistols (one of which fires fully automatically and qualifies statutorily as a "machinegun"), parts for a third ghost pistol, and 486 rounds of ammunition.[3] (*See* PSR ¶¶ 12-13.) The following is a photo of the guns:

---

[3] The indictment in this case charged the first 4 guns, but not the ghost weapons.

U.S. SENTENCING MEMO    3
24-CR-00154 CRB



In a taped call from jail after his arrest by state authorities following the search of his home, Mr. Conkey told his mother, "I'm almost 60 years old, mom; I can't go back to prison. I'm sorry I made a mistake. I was collecting guns. I bought one because—I can't—I can't even talk about it on the phone. Somebody was trying to rob me because they thought I was some old dope fiend. And now I have a business, and they thought I'd be an easy mark or something. That's what it all started with."

After Mr. Conkey was indicted in this case and taken into federal custody, the magistrate judge, recognizing Mr. Conkey's struggle with addiction, released him pretrial over the government's objection to the New Bridge Foundation for drug treatment, with his wife (the mother of his minor children) posting an unsecured $50,000 bond as surety. (PSR ¶ 4 & n.1.) The magistrate judge admonished Mr. Conkey that "the consequences of not going forward with New Bridge, deviating, absconding, are severe." (Recording of Apr. 18, 2024 Detention H'rg, at 19:41-19:48.) The magistrate judge added that

1  "there are consequences if you don't comply. And part of it is you're going to jeopardize the livelihood
2  of your children—where they live and what kind of life they are going to have going forward. So if
3  there's anything that I can emphasize to you now is where you're about to go is going to have
4  meaningful impact on the future of your children." (*Id.*, at 19:57-20:22.)

5     None of these warnings mattered. Mr. Conkey violated New Bridge's rules, eventually
6  absconding on May 30, 2024, after being told he would need to appear in court for this case because of
7  his violation of New Bridge rules. (PSR ¶ 5.) He told the facility's staff that "I do not trust what will
8  happen in court tomorrow" and "I am not ready to be incarcerated again, and I'd rather have death by
9  police." (PSR ¶ 5.) He failed to appear on May 31, 2024. (PSR ¶ 5.) He then went to his wife's home
10 and was arrested for misdemeanor domestic violence there by state authorities before returning to
11 federal custody. (PSR ¶ 5.)

# ARGUMENT

The Court is familiar with the legal standards applicable to sentencing. *See, e.g.*, *United States v. Carty*, 520 F.3d 984, 991-94 (9th Cir. 2008). Here, the sentencing-guidelines range is 97 to 121 months' imprisonment with 1 to 3 years supervised release. The government recommends the low end of the range for imprisonment—97 months—and the maximum 3 years of supervised release.

## I. The Guidelines Range Is 97 to 121 Months

The correct calculation of Mr. Conkey's guidelines range of 97 to 121 months is in the following table:

|  | U.S.S.G. Section | Level/Points |
|---|---|---|
| Base offense level (two prior controlled substance offenses and fully automatic pistol that is a "machinegun," a firearm described in 26 U.S.C. § 5845(a)) | § 2K2.1(a)(1) | 26 |
| Specific offense characteristics (3 or more firearms) (1 firearm stolen) | § 2K2.1(b) | +3 (+2 for each characteristic, but cannot result in a base offense level higher than 29) |
| Obstruction and related adjustments (abscondment / failure to appear) | § 3C1.1 | +2 |
| Acceptance of responsibility | § 3E1.1 | -3 |
| Total offense level |  | 28 |
| Criminal History Category |  | III |
| **Range** |  | 97-121 |

Probation, the defense, and the government each arrive at different guidelines calculations based on disagreements on only two points: (1) whether the obstruction adjustment in § 3C1.1 applies and (2) whether Mr. Conkey's 2 prior convictions for possession for sale of a controlled substance under Section 11378 under California law are "controlled substance offenses" within the meaning of the guidelines, increasing Mr. Conkey's base offense level under § 2K2.1(a)(1). The government agrees with Probation that the obstruction adjustment applies. As to whether Mr. Conkey's prior convictions count as controlled substance offenses, the government's view, with which Probation and the defense disagree, is

that they do.

### A. The Obstruction Adjustment in § 3C1.1 Applies

While the defense argues that the obstruction adjustment does not apply here because Mr. Conkey did not willfully obstruct justice by absconding pretrial from his treatment facility and failing to appear, the government agrees with Probation that it was willful obstruction because Mr. Conkey himself said so. He announced that he was absconding because he did "not trust what will happen in court tomorrow" and was "not ready to be incarcerated again." (PSR ¶ 5.)

### B. Mr. Conkey Has Two Prior Convictions for Controlled Substance Offenses for Purposes of § 2K2.1(a)(1)

Mr. Conkey's state-court convictions in 2007 and 2019 under Section 11378 for possession for sale of a controlled substance (methamphetamine) are controlled substance offenses under the guidelines. The Ninth Circuit has consistently held so. *See United States v. Ceja*, 23 F.4th 1218, 1226 (9th Cir. 2022) (affirming district court's finding that defendant's "two prior convictions under California Health and Safety Code § 11378 are controlled substance offenses" under the guidelines); *United States v. Cowan*, No. 23-50007, 2024 WL 2717398, at *1 (9th Cir. May 28, 2024) (unpublished) (affirming sentence on same basis); *United States v. Martinez*, No. 23-50011, 2024 WL 2717714, at *1 (9th Cir. May 28, 2024) (unpublished) (substantially the same opinion as *Cowan* issued the same day affirming sentence on same basis).

Under the "categorical approach," Mr. Conkey's Section 11378 convictions count as controlled substance offenses because "California's definition of methamphetamine is a categorical match to the definition under the federal CSA [Controlled Substances Act]." *United States v. Rodriguez-Gamboa*, 972 F.3d 1148, 1154 n.5 (9th Cir. 2020). That is, because federal and state law define methamphetamine the same way, when Mr. Conkey possessed methamphetamine for sale in violation of Section 11378 for state-law purposes, he necessarily possessed for sale a "controlled substance" for purposes of the guidelines, which incorporate the federal CSA's definition of "controlled substance," *see United States v. Leal-Vega*, 680 F.3d 1160, 1167 (9th Cir. 2012) ("In order to effectuate the goal . . . of arriving at a

national definition to permit uniform application of the Sentencing Guidelines, we hold that the term 'controlled substance,' as used in the 'drug trafficking offense' definition in U.S.S.G. § 2L1.2, means those substances listed in the [federal] CSA.").

The defense contends—incorrectly—that the California and federal methamphetamine definitions are not a categorical match and that the Ninth Circuit has not already foreclosed this argument. In particular, the defense, relying almost entirely on two district court cases from the Southern District of California, argues that California's definition of what is a regulated methamphetamine analog is broader than the federal definition. *See United States v. Morales-Rodriguez*, 744 F. Supp. 3d 1036, 1051-57 (S.D. Cal. 2024); *United States v. Verdugo*, 682 F. Supp. 3d 869, 873 (S.D. Cal. 2023). The defense contends that California's definition of methamphetamine analogs is broader than the federal one in two ways.

First, the defense claims, California law (disjunctively) requires the analog to be *either* substantially similar in chemical structure to methamphetamine *or* substantially similar in actual, represented, or intended effect on the central nervous system, while federal law (conjunctively) requires the analog to be substantially similar in *both* chemical structure *and* actual, represented, or intended effect. *See, e.g.*, *Verdugo*, 682 F. Supp. 3d at 872. In fact, the federal statute is actually disjunctive, like the state one, using the word "or" to separate the relevant subparts.[4] *See* 21 U.S.C. § 802(32)(A); *United States v. Nazerzadeh*, 73 F.4th 341, 347 (5th Cir. 2023) (noting that the Fifth Circuit has "rejected [a]

---

[4] The federal definition reads as follows:

Except as provided in subparagraph (C), the term "controlled substance analogue" means a substance--

(i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;

(ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; *or*

(iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

21 U.S.C. § 802(32)(A) (emphasis added).

conjunctive reading of 21 U.S.C. § 802(32)(A)); *United States v. Woods*, 571 U.S. 31, 45 (2013) (noting that "or" in "ordinary use is almost always disjunctive"). The California statute is therefore not broader.

Second, the defense argues, California's definition of methamphetamine analogs is broader than the federal one because California's includes analogs that are not intended for human consumption. Contrary to the defense's suggestion, California law, like federal law, considers substances to be analogs only if they are intended for human consumption. The California statute excludes from the definition of "controlled substance analog" a "substance, before an exemption as specified in paragraph (2) [for the investigational use of a new drug "under Section 505 of the federal Food, Drug, and Cosmetic Act (21 U.S.C. Sec. 355)"] takes effect with respect to that substance, to the extent the substance is not intended for human consumption." Cal. Health & Safety Code § 11401(c)(3).[5] Section 355 applies only to drugs for human use; Section 360b applies for new animal drugs. *See* 21 U.S.C. §§ 355, 360b. Thus, under California law, a regulated analog is always intended for human consumption. If a substance is not intended for human consumption, then Section 11401(c)(3) excludes it from being an analog, unless Section 11401(c)(2) applies because the substance has an exemption for investigational use under 21 U.S.C. § 355. But all drugs with such exemptions are necessarily also intended for human consumption because the exemption applies only to drugs for humans. Federal and California law remain a categorical match: neither regulates analogs not intended for human consumption. This result is no surprise, given that the federal and state statutes defining what is not an analog are nearly identical. *Compare* Cal. Health & Safety Code § 11401(c), *with* 21 U.S.C. § 802(32)(C).

In any event, Mr. Conkey's arguments all fail for the independent reason that the Ninth Circuit has already rejected them. *See Cowan*, 2024 WL 2717398, at *1; *Martinez*, 2024 WL 2717714, at *1. The defendants in *Cowan* and *Martinez* raised exactly the same points that Mr. Conkey does,[6] and the Ninth Circuit

---

[5] Federal law has a provision that is substantially the same. *See* 21 U.S.C. §802(32)(C)(iv) (excluding from the definition of "controlled substance analogue" "any substance to the extent not intended for human consumption before such an exemption [for investigational use under section 355] takes effect with respect to that substance").

[6] (Huynh Decl. Ex. F 15-33; Ex. G 13-32.)

U.S. SENTENCING MEMO                9
24-CR-00154 CRB

> decline[d] to read *Rodriguez-Gamboa* as holding only that California's CSA statute is a categorical match because of the chemical structure of methamphetamine, but as leaving open the possibility that it is not a categorical match due to other arguments. *Rodriguez-Gamboa* stated unequivocally that "as a matter of law" the statutes were a categorical match and did not limit its holding to its facts. It accordingly binds Martinez despite his text-based arguments that California's statute is overbroad as to the federal CSA.

*Cowan*, 2024 WL 2717398, at *1 (footnote and citation omitted); *Martinez*, 2024 WL 2717714, at *1 (footnote and citation omitted).[7]

Even if California's definition of methamphetamine analogs were somehow more expansive than the federal definition—which it is not—the defense's contentions fail for two additional independent reasons. The first is that Mr. Conkey has failed to show the required "realistic probability" that California "would apply its statute to conduct that falls outside the [federal] definition." *United States v. Acevedo-De La Cruz*, 844 F.3d 1147, 1150 (9th Cir. 2017) (quoting *Gonzales v. Duenas–Alvarez*, 549 U.S. 183, 193 (2007)). "To show that realistic probability, the defendant 'must at least point to his own case or other cases in which the state courts in fact did apply the statute in [such a way].'" *Id.* (quoting *Gonzales*, 549 U.S. at 193). Mr. Conkey points to *People v. Becker*, 183 Cal. App. 4th 1151, 1153 (Cal. Ct. App. 2010) as an example of California prosecuting possession of a methamphetamine analog, but that case offers no help. It involved a prosecution for possession of ecstasy, or MDMA, *see id.* at 1155, which is also a controlled substance under federal law, *see, e.g.*, *United States v. Casey*, 444 F.3d 1071, 1072 (9th Cir. 2006) (observing "3,4–methylenedioxymethamphetamine (MDMA)" is a federal "controlled substance commonly referred to as 'ecstasy'"). Mr. Conkey has pointed to no instance of California prosecuting someone for possession for sale of a methamphetamine analog not intended for human consumption. There is no realistic probability that California will apply Section 11378 in a way that makes it broader than federal law, so Section 11378 offenses necessarily are controlled substance offenses for federal guidelines purposes.

---

[7] While the defense points to *Ugalde v. Bondi*, No. 23-2400, 2025 WL 763475, at *1 (9th Cir. Mar. 11, 2025) (unpublished) as indicating that the Ninth Circuit has not addressed Mr. Conkey's specific arguments yet, in light of *Cowan* and *Martinez*, *Bondi* could have meant only that the Ninth Circuit has not addressed those arguments in a published opinion yet. If the Ninth Circuit decides to do so one day, *Cowan* and *Martinez* show that the Ninth Circuit will reject them.

U.S. SENTENCING MEMO                    10
24-CR-00154 CRB

The second independent reason Mr. Conkey's argument fails, regardless of whether Section 11378 is textually broader than relevant federal law, is that Mr. Conkey's convictions were specifically for methamphetamine (not an analog), and methamphetamine is undisputably a controlled substance under federal law. The modified categorical approach allows the Court to examine certain of Mr. Conkey's state conviction records to see if his offenses fall within the scope of federal law. *See United States v. Vega-Ortiz*, 822 F.3d 1031, 1034 (9th Cir. 2016). This approach applies if the California statute is divisible, which it is because it treats the identity of the controlled substance or analog as an element of the offense, effectively creating, for each controlled substance or analog, a different crime of possession for sale. *See id.* at 1035 ("[I]t is well-settled that California treats the identity of a controlled substance as an element that must be found by the jury, further supporting the conclusion that § 11378 is divisible.")[8]; *People v. Silver*, 230 Cal. App. 3d 389, 397 (Cal. Ct. App. 1991) (approving of a jury instruction that stated that "[t]he burden is on the prosecution to prove beyond a reasonable doubt that M.D.M.A. is an analog of methamphetamine").

The charging instruments (complaints) for Mr. Conkey's convictions charge him specifically with violating Section 11378 by possessing methamphetamine for sale, and the abstracts of judgment show that Mr. Conkey pleaded guilty to those particular methamphetamine counts. (Huynh Decl. Exs. A, at 1; C, at 7; D; E, at 2); *see Cabantac v. Holder*, 736 F.3d 787, 793–94 (9th Cir. 2013) ("We hold that where, as here, the abstract of judgment or minute order specifies that a defendant pleaded guilty to a particular count of the criminal complaint or indictment, we can consider the facts alleged in that

---

[8] For this reason, California's model jury instructions for Section 11378 differentiate between a controlled substance and an analog of a controlled substance and include the following instruction for analog charges:

> [In order to prove that the defendant is guilty of this crime, the People must prove that _____ <insert name of analog drug> is an analog of _____ <insert type of controlled substance>. An analog of a controlled substance:

CALCRIM No. 2302. To convict, the jury must find that the defendant possessed a particular analog, rendering the particular analog drug an element of the crime and making the statute divisible as to analogs.

U.S. SENTENCING MEMO                        11
24-CR-00154 CRB

count."). Because Mr. Conkey's convictions were for methamphetamine and methamphetamine is a controlled substance under federal law, his convictions were controlled substance offenses for purposes of the federal sentencing guidelines.

## II. The Court Should Sentence Mr. Conkey to 97 Months' Imprisonment

Given the correct guidelines range for Mr. Conkey is 97 to 121 months, the government recommends a sentence of 97 months' incarceration—the very bottom of his range. The government agrees with the rest of Probation's sentencing recommendation: 3 years' supervised release, no probation, a waived fine, and a special assessment of $100. The government recommends a 97-month period of imprisonment to ensure specific deterrence of Mr. Conkey and to protect the public.

### A. A 97-Month Sentence Is Necessary to Specifically Deter Mr. Conkey

Mr. Conkey's history presents the Court with enough data points to establish that, unfortunately, only a significant prison sentence holds any hope of specifically deterring Mr. Conkey from reoffending. All other approaches have been tried and failed.

Drug treatment has not worked. Mr. Conkey, who has abused substances and alcohol since childhood, has said that he possessed guns because he was using drugs and afraid he would be robbed. (PSR ¶ 15.) He has also told Probation that his addiction struggles influenced his commission of the instant offense. (PSR ¶ 95.) One could imagine that addressing his substance abuse holds some possibility of rehabilitating him into a person who will not reoffend. But that approach has already been tried unsuccessfully. Mr. Conkey has been to rehab programs at Walden House, Marin Services for Men, Center Point, Silverhill, Guenster Rehab, Daytop, Delancey Street, St. Anthony's, and most recently the New Bridge Foundation. (PSR ¶¶ 94-95.) When he absconded from the New Bridge Foundation during pretrial release in this case, he did so even after his wife, mother of his minor children, put her own and their children's financial security at risk for him by posting an unsecured $50,000 bond—even after the magistrate judge specifically warned him that leaving New Bridge would "jeopardize the livelihood of [Mr. Conkey's] children—where they live and what kind of life they are going to have going forward." *See supra* p. 5. Mr. Conkey has always relapsed into drug use or, in the

case of New Bridge, failed to complete the program.

Lighter prison sentences have not worked. Mr. Conkey has been sentenced to over 250 months' imprisonment for 11 prior felony convictions. (*See* PSR ¶¶ 34-49.) Yet he reoffended. He was sentenced in 2007 to an aggregate of 9 years' imprisonment, including 4 years and 8 months for being a felon in possession of a firearm (a sawed-off shotgun) and ammunition. (*See* Huynh Decl. Exs. A; C, at 1.) Yet he reoffended, this time possessing, in addition to a shotgun, an AR-15-style rifle, 2 revolvers, 2 ghost pistols (one fully automatic), parts for a third ghost pistol, and 486 rounds of ammunition. (*See* PSR ¶¶ 12-13.) The prison sentences to date have not just failed to deter recidivism, they have failed to stop Mr. Conkey from worsening his conduct.

A stiffer sentence is therefore appropriate here, and the guidelines provide one: 97 months on the low end. The low end of the range takes into account Mr. Conkey's difficult childhood and his lifelong struggle with addiction, while also ratcheting up jailtime to achieve specific deterrence.

**B.    Incarceration Is Necessary to Protect the Public**

In addition to specific deterrence, Mr. Conkey's imprisonment is necessary "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). He is a man who has demonstrated the ability to arm himself in a manner as fit for warfare as it is for crime: 6 guns—including an AR-15-style rifle with red-dot sight, a shotgun, and a fully automatic ghost gun—along with 486 rounds of ammunition. (*See* PSR ¶¶ 12-13.) He is also a man who faces major mental-health struggles, including diagnosed conditions. (*See* PSR ¶ 90.) When he absconded from New Bridge just over a year ago, he said he would rather have "death by police" than incarceration (PSR ¶ 5), indicating that he has apparently thought about instigating a shoot-out with police as a way to commit suicide. Moreover, he struggles with substance abuse. (*See* PSR ¶¶ 93-94.) The mixture of Mr. Conkey's mental instability, drug use, and proven ability to obtain guns means that he presents a danger and should be incapacitated via incarceration.

U.S. SENTENCING MEMO                            13
24-CR-00154 CRB

# CONCLUSION

For the foregoing reasons, the government recommends that the Court sentence Mr. Conkey to 97 months' imprisonment and 3 years' supervised release, along with a special assessment of $100 and no fine.

DATED: September 26, 2025

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

/S/
PHIL HUYNH
Special Assistant United States

U.S. SENTENCING MEMO    14
24-CR-00154 CRB